25-800-Frank v. Gray Absentee polling place buffer zones censor the most important form of free speech at the most important time in a most important place. They censor electioneering during the height of election season around the very government offices that are among those subject to the forthcoming election, particularly at the Laramie County Government Complex. This Court should reverse the Court below and find that Wyoming Statute 22-26-113 is unconstitutional facially or at the very least as applied to some of Mr. Frank's or all of his activities around the Laramie County Government Complex. When this Court remanded two years ago to consider this issue, it stated in its opinion that the real question here is a matter of tailoring. What does the absentee polling place, what do buffer zones outside of election day do to Burson v. Freeman? And we submit that it implicates traditional strict scrutiny rather than the modified burden of proof applied in that case. And we say this for several reasons. The first being that there's fundamentally not a clash of voting rights and free speech here. Rather, it is now the expansion of voting wholly optional under the statute, wholly optional constitutionally, I would submit, that is going up against traditional free speech and traditional public forum. Why does that matter? I mean, that setting up absentee voting is an optional matter. How does that implicate the integrity of the vote? I mean, as a voter, I don't really care whether I'm voting absentee or not. And it would seem that Burson's concerns about the integrity of the vote, protecting it from being corrupted, protecting it from harassment, those don't change just by the fact that it is optional for Wyoming to set up this separate process. Why does that matter? Your Honor, I think it matters because fundamentally it comes down to redressability, right? I mean, first of all, I do want to say we submit that these are compelling governmental interests. Again, what the answer is is tailoring. Do you get to censor free speech around the absentee polling place for 28 days in the name of protecting that in the same way that you do on election day, right? Well, but the point I'm getting at is it seems to me that the same rationale that Burson applied for going to a modified tailoring program apply here, too. If you were focused on the act of voting, and specifically when that person is walking to the polling place to vote absentee, why does it matter that they're absentee as opposed to going on election day when the same concerns about corruption, integrity, harassment, all of those things that Burson was concerned about when it said, let's have a modified tailoring program, seem to be entirely applicable here. Two points, Your Honor. First is going to be redressability, and this is very important in Burson on the macro and the micro level. Burson said more than once to say, well, if things go wrong on election day, you can't redo the election. Here, it seems they're redoing the election a whole lot of days, right? Then at the micro level, let's get down to a voter who say, in the worst case scenario, is actually intimidated, right? What happens? There's redressability. They can vote the next day. They can vote by mail. There has to be this, you know, we seem to have an eggshell voter concern here as opposed to the civic courage that we have. You mean that it doesn't matter that I'm intimidated to go to the voting place? It doesn't matter that I say, oh, well, I need to vote absentee by mail because there are people out there who are harassing me? You think Burson's not concerned about that? Your Honor, I think Burson is absolutely concerned. The question is, do you get to just censor electioneering around this government facility in the name without any kind of tailoring whatsoever, right? And again, now we also have this big timeframe within which, if all these whole parade of horribles occurs, there again is redressability as far as if Mr. Franks somehow turns into an agent who's going to do that, right? He can be arrested. He can be, again, through less restrictive means. If someone's intimidating a voter, by all means, prosecute him or her for intimidating a voter. But we start to go into this illusion that even in this extended voting period, that oh, well, this is too, we can't see it. We can't see the intimidation. That's why we need to censor all election speech during election season around this  And I would submit this, again, that Burson was a prophylactic opinion, absolutely, but to extend it so far and start to eclipse a traditional public forum for the most important form of free speech, that is what we submit. You would agree if this were only an election day restriction that your claim would fail? Oh, absolutely. Yeah, this would fall under Burson. Your case isn't about the geographical reach of the restriction. It's about the temporal scope of it, the 28 days, or depending on whose calculations you're using, the multiple day restrictions, as opposed to the geographic scope. As to the holistic analysis, I think the temporal scope is our biggest hook, your honor. But geography isn't just about size. I think geography has to consider what's going on in the geography. And as we pointed out in the briefing, you speak of, and this is where Mansky comes in and these other election day polling places, they give a certain sanctity to the polling place. And perhaps that's rightfully true. But now you put it in the room with the snack bar. The line goes between the snack bar and the ATM. So people aren't intimidated by me getting a hot dog while they're voting. They're worried about me getting up in their face with a vote for Carson sign. Well, again, getting up in your face, your honor, these are, again, these things... They don't want me standing 10 feet away from them with a vote for Carson sign. Well, your honor, again, here's the other thing to look at with the temporal scope. Your honor is holding a Carson sign, you know, on election day or right during the time. Okay. But that's different. We were, you, you said, you said that you're not giving it, that geography can mean many things and that this is a busy building and that there's not the sanctity of the vote. And so because of the building has these characteristics, the geography matters. And now, now we're going back to the temporal scope. I just want to narrow it down. I mean, if we're just talking about the days, let's talk about the days. Well, your honor, respectfully on the prior Frank decision, I'm in a holistic analysis. I got variables, but I got to put them all together. Right. And they're going to, they're going to interplay. Right. And, and I, to try and circle back when I, when I see, you know, this season, the temporal scope right in that geography, in that traditional public forum, isn't that time for choosing that we spoke that we, I think is the quote in Mansky, it's time for campaigning. This is it. Well, right. Where does that end? After they get the ballot and head to the ballot box, can you still be in their ear? No, absolutely not. Your honor. We're talking about the traditional public forum outside the sidewalks, the streets. Mansky is very clear that it's a non-public forum in the polling place itself. And that's not where Mr. Frank. Does it matter here that, I mean, just looking at your picture, there is a lot of space in close proximity to this building where people park, where people walk, where they approach the building that your client could election here. Not for one-on-one communication. Your honor. Say, say it again. Not for one-on-one communication, not for distribution of literature or one-on-one communication.  Well, people don't just, just appear in the building. They have to park. They have to walk up to the building. I'm not sure I understand your point. Well, my point is, there's a circle drawn around it, but there is a lot of opportunity for your client to approach people in close proximity to the building when they, when they get there and park and want to go in and vote. I disagree for purposes of, I think for McCullen versus Coakley, which is a 35 foot zone, which significantly impinged upon a one-on-one communication. I would say that would probably be our best case. And that was an intermediate scrutiny case. And here, here we have content-based in traditional public forum, right? And I respectfully, and this is where Meyer v. Grant comes in, right? That was affirmed, I believe, by two judges on this panel who were discussing Meyer versus Grant saying, look, when you start infringing on this tried and true essentials of politicking, you have a problem. And this is where I think this holistic analysis around the, the very offices at issue, you know, again, I, and we do have it in the record that most of these absentee bowling places are courthouses, right? It's even in the statute for creation of absentee bowling places, it uses the word courthouse. And you know, U.S. v. Grace, it's very clear these are traditional public fora. These are the traditional, you know, this is what's being held open for people to engage in what Mr. Frank wants to engage in. And I don't think, respectfully, he needs to justify that. Well, there's a, well, the law is that he does need to justify it. Because, historically, there have been buffer zones. I mean, so the law has recognized that there are buffer zones and that they are legitimate. So yes, we're here talking about now whether this specific one is justifiable. And McCullen is, of course, something that puzzles me a little bit, and I want you to help me with it. It seems to me that your brief talks a lot about, emphasizes this is a government building, there are people going in there for government business. It strikes me that this, that in McCullen, there was a specific audience that was going for whatever reason, for abortion services, and there was a specific directed activity of speech addressing that activity. That's not what you have here. In other words, McCullen made something of the fact that the efficacy of this street that was being done, you had to have some distance in order to be able to do it. Here, you've got a bunch of people going in for wedding licenses, you've got a bunch of people going in for all of the manifold government services. Where is the same efficacy nexus that you had in McCullen? Your Honor, I think it's inherent in the fact that these are facilities and people interacting with government are going to be the people that Mr. Frank wants to talk to about the upcoming election. No, it isn't inherent. It's not inherent to me. It's not obvious to me that if I'm going, I don't know the full scope of what they do in that government complex, but if I'm going to get a wedding license, why do I care about Mr. Frank? I mean, why am I more susceptible and open to hearing what Mr. Frank does than anybody else? Your Honor, I mean, hypothetically, how was your service today? The county clerk's up for election. How'd she do issuing that marriage license? These are important questions that should be asked to the people that are participating or interacting with government. I think specifically county commission meetings, of which we know two, one is going to occur during absentee voting. One's going to occur leading up to the general election, so primary and general election. These are people that you're engaging. You have the audience here of people who actually participate, not just engaging in government services, but who are actually monitoring government, going to court, judges subject to election, district and circuit courts. So I respectfully, I think there's, this is a very important audience, right? And so everyone, the offices that are in that building consist of elected officials or people who are in control of the services that these people are receiving? Yes, Your Honor. County commission, the county clerk, the district attorney, I think the public defender. We have a list of the stipulated list in the record, Your Honor. You know, I speak, you know, I would like to reserve time for rebuttal if that's possible, unless there are any further questions, please. Thank you. May it please the court, counsel, my name is Jim Peters on behalf of the Wyoming Secretary of State and the Laramie County District Attorney in this matter. As the court's aware, this case involves the state's ability to regulate electioneering near polling places when in-person election, in-person voting is occurring. And it involves a delicate balance of first amendment rights, the right to political discourse and the right to vote freely from undue influence, intimidation and harassment. And so with that backdrop that the U.S. Supreme Court established the framework by which courts review prohibitions on electioneering near polling place, and that's in Burson versus Freeman. And that this court had the occasion to apply in what I'll refer to as Frank 1 to the election day buffer zones established by Wyoming Statute 22-26-113. And on remand, this court specifically directed the district court to engage in a holistic inquiry under Burson and analyze the buffer zones around absentee polling places. So are you saying then that this argument that we should apply strict, traditional strict scrutiny is off the table because of law of the case, because of Frank 1? Your Honor, I believe it is. I believe. And did you argue that in your brief? Your Honor, in our brief, we didn't specifically argue that, but we did point to that this court directed the district court to apply the Burson framework. And even if that's not the case, Burson still is applicable in this case because the same considerations are at play for in-person voting on election day and in-person voting in an absentee day. Don't you think it's even under the relaxed standard that it's excessive to make it where people can't even drive in front of the county building and on basically on three sides of it if they don't have a compliant vehicle as far as member stickers go or signage? Your Honor, I don't believe it is. The statute sets forth for purpose of absentee voting a 100-foot prohibition from the entrance to a polling place. In the Laramie County governmental complex, which has been the focus of this case, that zone does extend to portions of the adjacent streets, the sidewalks and the adjacent streets. But that's certainly not the case in all of the various facilities in which absentee zones may be applicable to. But Your Honor, what if I'm otherwise a political activist and I drive in front of that building every day on my way to work and Mr. Frank wants me to put some bumper stickers on my car and I just tell him, you know what, I am not going to drive out of my way every day just to have these bumper stickers. Doesn't that, isn't that the kind of chilling effect we're talking about here? Your Honor, I think a couple of responses to that. First, as this court recognized, Wyoming Statute 22-26-112 only criminalizes the conduct to the extent that it is engaged in knowingly and willfully. I'm knowingly and willfully doing it every day. It's right in my route to work and the reason I don't want to put them on there is because I don't want to run afoul of the law. Your Honor, I think that's exactly the grappling or the balancing that the state has to undertake in determining what sort of buffer zone is appropriate in this context. Could the state have carved out possibly all public streets and only permitted conduct in the immediate vicinity or the adjacent sidewalk to the polling place, perhaps. But that might have been maybe more appropriate under a least restrictive means or traditional strict scrutiny analysis. And that's not what the Supreme Court has applied for purposes of the tailoring aspect in Burson. The test is whether the restriction is reasonable and not a significant impingement upon free speech. And this court, in analyzing the election day buffer zone, said that, well, there is some guidance on what it means to significantly impinge on free speech. And the example is absolute prohibitions that are completely disconnected from the state's protection or the state's interest in protecting voters who are attempting to cast their ballots. And looking at the regulation here holistically, the geographic scope, the conduct prohibited and the temporal scope, which I want to focus on a little bit, the state has tailored, has limited the conduct prohibited in the area to only when in-person voting is occurring to that narrow space, 100 feet. That was the same distance that was upheld in Burson, the Tennessee statute, and only to conduct electioneering conduct outside there. Looking at the temporal scope, the plaintiffs in this case take issue with the duration. And we fleshed this out in our briefing, but I think it is worth a little bit of rehashing. The absentee polling period begins 28 days in advance of a primary or general election. But importantly, the statute isn't in effect for that entire time. The absentee polling restriction is only in place, or the buffer zone, if you will, around absentee polling places is only in effect when absentee voting is occurring. Well, but it only chills speech during the time that somebody would want to speak. Nobody wants to electioneer in front of the county building when there's nobody there. Your Honor, perhaps there may be a different audience when, you know, after 5 p.m. on a day than during the heart of the day. But I think, again, analyzing that with the purpose of these restrictions that was recognized by the Supreme Court in Burson, and again by this Court in Frank 1, we're looking at balancing those rights to engage in political discourse with the rights to, with the state's interest in protecting voters to be free from intimidation and harassment. Isn't it right, thinking about sort of geographic scope, and it implies that Temporal 2, isn't it the case that the voting takes place in the atrium between the two buildings, right? Your Honor, you are correct. And well, and there's an entrance into the atrium, right? Your Honor, yes, there is. Well, then why couldn't this have just restricted electioneering as it relates to going through that entrance, as opposed to this entire government building that has to have a buffer zone of 100 feet all around it? Your Honor, so importantly, the buffer zone isn't in place for the entire building and around the entire building. It extends 100 feet from the entrance to the public building. Every entrance to the public building, 100 feet from that, right? Your Honor, you are correct, yes. And I guess my point is, if people are going to vote in the atrium, and the atrium has its own entrance, why was it necessary to have a 100-foot buffer zone around every entrance? That's the point. Your Honor, again, the statute doesn't envision the exact location of where the absentee polling places are going to occur. There may be a facility that only has one entrance. There may be a facility that has multiple entrances. For purposes of the as-applied challenge to the Laramie County governmental complex, those zones are in place around multiple entrances. And Your Honor, I hate to go outside of the record, but I think there's a reasonable inference that interested persons or electors during absentee days are not only accessing the polling place through the atrium, that they would be accessing it or potentially would be accessing it from other entrances to the Laramie County governmental complex. I take it from your qualification that there isn't anything in the record that speaks to exactly the point that you just made? Your Honor, I don't believe there is anything in the record specific to the entrances by which voters themselves are accessing the atrium. Okay, so I'm sure I understand. Your point is there's nothing in the record that shows what door people come in. Your Honor, you are correct. I don't believe that there is. Your Honor, transitioning to the geographic scope. Again, this is the exact same distance. Let's stay on the temporal scope for a minute. You agree that the burden on the person wanting to have speech increases when you move it from election day to the entire early in absentee period? Your Honor, I would agree that there's an increased burden on an individual desiring to engage in electioneering. Okay, so at least as part of a holistic approach, that is a mark in favor of the plaintiff in this case. Your Honor, I think that it is. I think the district court looked at not only the temporal scope, looked at the geographic scope, the conduct prohibited. Additionally, the history of regulating or having buffer zones around absentee polling places and also consensus among other states that do have in-person absentee voting or early voting and weighed all of those factors in its decision in assessing the reasonableness and determining whether the restriction is narrowly tailored based on that modified burden applied by the person. So do you look at this on a day more than instead of looking at it period wide, are you looking at this on a day-by-day basis and saying that, okay, February 1 is a voting day and so we balance the restriction versus the voters' rights on that day in the protection of the vote. And then February 2, we do the same thing anew. Is that how you look at it? Your Honor, no. I think you need to look at the effect that the regulation has on speech. And so with that in mind, I don't think you're looking at an individual day-by-day basis. Okay, so you're not opposed to looking at it on a combined basis saying that we're at what's the effect of restricting this speech for 56 days, for example? Your Honor, I think you would look at the entirety of the duration in which speech is restricted and engaging in a holistic analysis of the entire scope of the regulation. And related to temporal scope again, while absentee voting period begins 28 days prior to the general or primary election, again, that buffer zone is only in place when voting is available at the complex. This is in the record or in the appendix at pages 81 and 82. It's only in effect generally Monday through Friday when the facility is open between 8 and 5. I really need help understanding why that is a persuasive point for you. Because, I mean, the reality is you're saying, well, you know, it's only in effect when people really want to talk. I mean, or when people would get any efficacy out of talking. I mean, what difference does it make if I go out there and shout to the moon when there's nobody at the government building, or I could go out there on the weekend and start shouting and there's nobody there, how am I helped? I mean, how is my burden decreased by that availability? Your Honor, I think this ties back to the narrow tailoring requirement and why the Supreme Court in person created the modified burden. It's that when there's an activity that physically interferes with electors attempting to cast their ballots. If there was no only when the facility is open, 8 to 5 restriction, and perhaps envision a scenario where it was the entirety of the absentee polling period, it was this buffer zone was in place, that wouldn't, or perhaps that might not be sufficiently tailored under the person analysis. Because at those later times, there are no electors that are attempting to cast ballots. So again, I think that does weigh in favor, while there's certainly some argument about, you know, additional temporal restriction and whether that weighs in favor of the plaintiffs, I think for purposes of that aspect of the temporal scope, I think that restriction and that narrowing weighs in favor of the state and upholding the absentee polling. Okay, I think that's somewhat helpful. So your point would be that Wyoming is not sort of willy nilly trying to just suppress speech and that really it's only doing what it thinks it needs to do to protect the integrity of the vote. Absolutely, Your Honor. Okay. And I think that's even further demonstrated by the changes to the scope of the absentee buffer zone that occurred in 2006 when absentee voting, in-person absentee voting was established or that option was established. The buffer zone was the same as on election day at 300 feet. But then the legislature grappled with that distance and ultimately determined that it was appropriate on absentee days to reduce that strict restriction to 100 feet when absentee voting is occurring. In addition to carve out a narrow exception for certain types of speech, namely bumper stickers of a certain size, of a certain number per candidate that are attempting to access the facility for purposes of voting. What was the reason for the 100 foot? Is it that it was less congested down there? The vote is diluted amongst the absentee in-person voters over that period, so you don't have a line, for instance. Your Honor, there isn't any express legislative history on that. But I think sort of with the publicly available information related to that bill, the introduced bill proposed to change the entire restrictions for all voting on election day and absentee days to 100 feet. That was subsequently changed through the legislative process. But I think you're correct. I think it is reasonable to infer that there are fewer electors congregating at the facility at the Laramie County Governmental Complex during absentee polling period because it's spread out amongst a number of days rather than one day where that is available. Your Honor, I see that I'm out of time. Would respectfully request that this court affirm the district court decision. Thank you. Thank you, counsel. Appreciate my opposing counsel's understanding of the record. We did so stipulate, pages 80 to 82 of the record, that the polling place, the atrium is accessible through the entrances on 20th and 19th Street. There is nothing really in the record about whether people do that or not. So I just want to be clear about that. This gets us to this as-applied relief. At the bare minimum, give Mr. Frank the ability to hand out literature on 20th Street. That's all you have there are the warnings taped to the sidewalk that say don't electioneer here. That's all you have. Whereas around the corner on Cary Avenue, the county clerk has put up some really big vote here signs. And moreover, as Judge Carson has used that. That's not electioneering. That's not giving a political message, is it? No, Your Honor. It goes to Judge Holmes's point about that this is the entrance to the atrium. This is the entrance people are probably actually using. Fair enough. And then Mr. Frank should be entitled, as anybody should, to have more than two bumper stickers for the same candidate on his car and be able to drive downtown. And I'll say if anybody after six years of litigation would commit a knowing and willful violation, it's probably my client. So I would ask for relief in that regard as well. So what's the limit? What if you had a four foot by eight foot sign on top of your car? Let him at least pass through the zone. Mr. Peters said delicate balance. This is indelicate and we speak. We didn't speak much today about overbreath, but you know, even though it's content neutral, the idea that you cannot gather a signature for a petition around the government for 56 days, right? I mean, that's not, yeah, it's content neutral, but that wouldn't survive a traditional time manner place. Understanding? Bumper stickers not for beyond Mr. Frank. Wearing a t-shirt, right? Electioneering apparel. You can't go visit the government to take care of business, right? Under the modified standard, can the Wyoming legislature consider that the voting area could get so awful and unpleasant with, he's a skunk, no, you're a skunk, don't vote for him because it's not just Mr. Frank that's going to be down there. Whoever is on the opposite side of issues as him better be down there and it can get so awful that people are just, I'm not dealing with it. I'm not voting. Not a valid consideration. Your honor, I think I go back and we briefed, you know, about, about having a modicum of civic courage. I don't want to diminish voting rights or I don't want to diminish that there's compelling interest to protect voting even during the absentee period. I'm just saying that now you're eclipsing, you know, all of this in the name of a parade of horribles, right? That could be resolved with, you know, if voter intimidation is occurring, prosecute that. That's the beauty of traditional strict scrutiny. It's not to say these aren't compelling governmental interests. It's just that you got to build a record and show why you're doing it, right? And to Burson's point, I'll close on this. Burson's point, you know, this court has already affirmed the election day zone, right? So you're not going to have to rerun the election, even if these experiments are allowed to happen during absentee voting that permits free speech before censoring it. Unless there are no further questions. Yes, I do have one. You said that, I mean, playing off what Judge Phillips said, I mean, in part of Burson's justification for going for a modified tailoring that it's some of these things are hard to  They're hard to decipher exactly what the implication of this harassment is in the moment and even in over 28 days, if it just gets unpleasant down there. I mean, if it just gets ugly down there and somebody hasn't necessarily committed a crime, isn't that a valid legislative consideration that there may be people say, to heck with it. I don't want to go down there and be confronted by that. Why isn't that a valid consideration? It's a valid consideration, Your Honor, but if censorship is the solution to addressing it, then it needs to be proven up in the record and narrowly tailored. But isn't that what Burson said that when in justifying the modified approach that sometimes these things are hard to have proof about? Your Honor, in combination with the concerns that if something goes wrong, we can't redo the election or that voter is not going to come back that day. That's not an issue in the absentee voting period. Thank you. Thank you. Case is submitted. Thank you for your fine arguments. Court will be in recess. Thank you.